TAYLOR and others *v*. INSURANCE COMPANY OF NORTH
AMERICA.

*(Circuit Court, D. Massachusetts. February 26, 1881.)*

1. DELIVERY TO CONSIGNEE—TENDER OF GOODS IN HOLD OF WRECK—
   BILL OF LADING.

   Certain consignments of goods were shipped in the bark Almira
   Coombs, and stowed in the lower hold. The bills of lading contained
   this clause: "To be landed in ship's lighters at risk and expense of
   consignees." The vessel was subsequently wrecked in the port of
   delivery, and a few tons of the goods taken out of the lower hold, but
   not the whole of any one consignment. Upon a survey of the wreck
   the surveyors reported that no more goods could be recovered with-
   out great expense, the hold being full of water, and that the attempt
   ought not to be made because the value was insufficient to justify the
   expense of recovering them and the risk that must thereby be incurred,
   and advised a prompt sale of the ship and cargo as they then lay.
   *Held*, that a tender to the consignees of the goods which had been
   landed, and an offer to deliver those still on board upon payment of
   the landing charges and freight, was not sufficient to entitle the ship
   to freight.

2. INSURERS—PROCEEDS DERIVED FROM SALE OF GOODS INSURED—
   FREIGHT.

   *Held, therefore*, that insurers who had paid a total loss upon the
   goods, and received from the insured assignments of the bills of lad-
   ing and of all their rights of salvage, were entitled to so much of the
   proceeds derived from the sale of the ship and cargo as represented
   the goods insured by them.—[ED.

In Admiralty.

*Paul West*, for appellants.

*C. T. Russell* and *C. T. Russell, Jr.*, for libellants, appellees.

LOWELL, C. J. The libellants insured certain consign-
ments of goods shipped by Laforme & Frothingham and H.
C. Peabody & Co. in the bark Almira Coombs, on a voyage
from Boston to Port Elizabeth, Algoa bay, South Africa. All
these goods were stowed in the lower hold. The bills of lad-
ing contained this clause: "To be landed in ship's lighters at
risk and expense of consignees."

The vessel arrived at Port Elizabeth on Sunday afternoon,
July 14, 1878, and on Monday the master reported his ar-
rival, entered his bark at the custom-house, and made ar-

rangements for lighters.  On the morning of the 16th there was a very severe gale from the south-east, and the ship was driven on shore and bilged.  On the 17th a survey was called and the surveyors reported the vessel a complete wreck, water flowing in and out with the tide, and seven feet of water in the hold at low tide.  They recommended that every reasonable measure should be taken to land the cargo.  All the cargo between decks was landed, delivered, and freight paid for it by the consignees concerned.  A few tons of goods were taken out of the lower hold, among which were some of those insured by the libellants, but not the whole of any one consignment. July 20th, upon a second survey, the surveyors reported that some goods had been discharged, and that no more could be recovered without great expense, the hold being full of water, and that the attempt ought not to be made because the value was insufficient to justify the expense of recovering them, and the risk that must thereby be incurred, and they advised a prompt sale of the ship and cargo as they then lay.

The captain tendered to the consignees the goods which had been landed, and offered to deliver those still on board upon payment of landing charges and freight.  The consignees, who were also the absolute owners of the cargo, refused to receive their cargo on these terms, and made no objection to the sale, which was duly made by auction, and the proceeds have come into the hands of the respondents,—the owners of the ship,—and the libellants sue for so much of the proceeds as represent the consignments insured by them.  They have paid a total loss upon the goods, and have received from the insured assignments of the bills of lading and of all their rights of salvage.  The district court decreed for the libellant's, and an assessment was made, which I do not understand to be objected to, if the principle of the decree was right.  No question is made that the libellant corporation has the right to receive whatever the consignees might have recovered;  but it is insisted by the respondents that the freight of these goods was earned, and was a first lien upon them, and, of course, upon their proceeds.  The conclusion is sound if the premises are sound.

Had the ship earned her freight? To earn freight there must, of course, be either a right delivery, or a due and proper offer to deliver the goods to the consignees. There was no delivery, and therefore the only question is whether the master's offer to deliver the goods was one which the consignees were bound to accept. I assume that the goods remained *in specie,* somewhat damaged, but not destroyed. The few tons of goods which had been landed did not fill any one bill of lading, and the consignees were not bound to receive them unless they were equally bound for all the others.

Was the offer to deliver the whole a good offer? It seems from the second report of the surveyors that there is very great reason to doubt whether the master would have been able to fulfil such an offer. I understand it to have been made merely as a matter of form, for what it might be worth. A tender is good for nothing if the party making it is not in a condition to carry it out. But the theory of the offer was unsound. It was that, as the ship was in the port of delivery, and as the consignees were to pay the expense of the lighters, therefore, whatever it might cost to fish up the goods from the bottom of the sea and put them on board the lighters was to be paid by the consignees. The survey proves that the work would have been in the nature of salvage, and of course must be paid for at extraordinary rates. This is not the meaning of the contract. The ship's lighters were to land the goods in the way usual at that port, and all usual expenses of the landing by the lighters were to be payable by the consignees. A very good test of the point is whether the arrangement which the master had made on Monday with a company owning several lighters would hold good on Tuesday, and bind the company to land the goods from the wreck at the agreed price. Obviously it would not.

The consignees were not bound to accept or decline an offer made under these circumstances. If they declined it, the master had no greater right or interest in the goods by reason of this refusal. There is no evidence that the consignees abandoned the goods to the master for the freight. The sale was simply and very properly made for the benefit of all per-

sons interested, and was conducted in good faith, and, for all that appears, was the best thing possible. The master had no more earned his freight than if he had sold the goods for cause at a port of necessity.

Affirmed.